UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

v.

Juana Trujillo-Granados,

        Defendant.

Criminal No. 14-20(2) (MJD/SER)

**REPORT AND
RECOMMENDATION**

LeeAnn K. Bell, Esq., United States Attorney's Office, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55101, for Plaintiff.

Shannon R. Elkins, Esq., Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, Minnesota 55415, for Defendant.

STEVEN E. RAU, United States Magistrate Judge

The above-captioned case came before the undersigned on Defendant Juana Trujillo-Granados's ("Trujillo-Granados") Motion to Suppress Search and Seizure ("Motion to Suppress Evidence") [Doc. No. 72], and Motion to Suppress Statements, Admissions, and Answers [Doc. No. 73] (collectively, "Motions to Suppress"). This matter has been referred for the resolution of the issues raised in Trujillo-Granados's Motions to Suppress pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, the Court recommends that Trujillo-Granados's Motions to Suppress be denied.

**I.     BACKGROUND**

On January 21, 2014, Plaintiff the United States of America (the "Government") filed an indictment charging Trujillo-Granados with one count of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. (Indictment) [Doc. No. 1]. At the pretrial motions hearing, Officer Travis Ocken ("Officer Ocken") testified

on behalf of the Government.  (Ex. and Witness List) [Doc. No. 88].  The Court received the application for the search warrant at issue in this case (the "Search Warrant") and its supporting affidavit into evidence.  (*Id.*).  The matter was taken under advisement after the parties submitted supplemental briefing.  *See* (Trujillo-Granados's Supplementary Mem. in Supp. of Suppression "Trujillo-Granados's Supplemental Mem. in Supp.") [Doc. No. 95]; (Gov't's Post-Hearing Resp. to Def.'s Mot. to Suppress Evidence, "Gov't's Supplemental Resp.") [Doc. No. 100].  Trujillo-Granados did not file a reply, and the Motions to Suppress were taken under advisement on May 28, 2014.  *See* (Order Dated May 5, 2014) [Doc. No. 90].  This case is set for trial before Chief Judge Michael J. Davis on June 23, 2014.  (Order to Continue Trial and Exclude Time Under the Speedy Trial Act) [Doc. No. 93].

In her Supplemental Memorandum in Support of her Suppression Motions, Trujillo-Granados's withdrew her Motion to Suppress Statements, Admissions, and Answers.  (Trujillo-Granados's Supplemental Mem. in Supp. at 1).  Given Trujillo-Granados's withdrawal of her Motion to Suppress Statements, the Court recommends that the Motion be denied as moot.

## II.   FACTS

Bloomington, Minnesota Police Officer C. McHarg ("Officer McHarg") submitted the application for the Search Warrant and a supporting affidavit on October 10, 2013.  (Gov't's Ex. 1 at 4).  A Hennepin County District Court Judge signed the Search Warrant on the same day.  (*Id.*).

The following information was contained in the Search Warrant's supporting affidavit, completed by Officer McHarg.  *See* (*id.* at 2–4).  During a narcotics investigation, Officer McHarg learned of a high level narcotics trafficker (the "Trafficker"), alleged to have ties to a cartel in Mexico who was arrested in Bloomington in August 2013.  (*Id.* at 2).  After the arrest of

the Trafficker, Officer McHarg continued investigating the Trafficker's drug operation by communicating with a confidential informant (the "Informant") who had direct knowledge of and contact with the Trafficker.[1] (*Id.*). Pursuant to his investigation, Officer McHarg found that the Trafficker sent drugs to Minneapolis, Minnesota. (*Id.*). In addition, Officer McHarg learned that the Trafficker used several stash locations in Minneapolis for narcotics and money from the sale of narcotics. (*Id.*).

On approximately October 1, 2013, the Informant told Officer McHarg that the Trafficker was planning three shipments of narcotics, including methamphetamine and cocaine, to Minneapolis in the coming week. (*Id.*). The Informant provided Officer McHarg with specific information about the shipments and their projected arrival times in Minneapolis. (*Id.*). The Informant also told Officer McHarg that two individuals, "Hector" and "Blanca," assisted the Trafficker with his drug organization in Minneapolis by delivering narcotics and collecting payment.[2] (*Id.*). The Informant provided Officer McHarg with the Minneapolis residential address of Hector and Blanca on Sixth Street North in Minneapolis. (*Id.*). In addition, the Informant had been instructed by the Trafficker to contact Hector and Blanca to coordinate the rental of a storage unit at a Minneapolis storage facility. (*Id.*).

---

[1] The Search Warrant did not explain how the Informant began his/her relationship with law enforcement; the parties both acknowledge that the Informant had first been arrested for narcotics before becoming an informant. (Trujillo-Granados's Supplemental Mem. in Supp. at 2); (Gov't's Supplemental Resp. at 1 n.1). Trujillo-Granados refers to the Informant by name, however, because the Search Warrant and supporting documentation does not establish the identity of the Informant, the Court will refer to him/her as the "Informant." *See* (Trujillo-Granados's Supplemental Mem. in Supp. at 2). In addition, the Government asserts that it is almost universally true that an informant had previously been arrested. (Gov't's Supplemental Resp. at 1 n.1).

[2] Hector was later identified as as Jose Hector Hernandez Corro ("Corro") by Officer McHarg, and the Informant picked Corro out of a photo lineup as "Hector." (*Id.* at 3). "Blanca" was later identified as Trujillo-Granados. (Gov't's Supplemental Resp. at 1 n.2).

On approximately October 5, 2013, the Informant told Officer McHarg that Hector wanted the Informant to meet him at Hector's residence on Sixth Street North in Minneapolis. (*Id.*). Officer McHarg and other law enforcement officers conducted surveillance of the residence on Sixth Street North in Minneapolis. (*Id.*). While conducting surveillance, Officer McHarg observed the Informant arrive at the residence as a passenger in a red Chevrolet Aveo and then observed the Informant enter the residence and stay inside for approximately an hour. (*Id.*). The driver of the Chevrolet Aveo (the "Runner") waited in the car the entire time the Informant was inside the residence. (*Id.*). Also during the surveillance, Officer McHarg saw a white van parked in front of the residence, which the Informant had identified previously as the van of Hector and Blanca. (*Id.*). After the Informant exited the residence, he returned to the Chevrolet Aveo, at which time the Runner dropped the Informant off at Informant's known residence. (*Id.*).

On the same day, sometime after the Informant had been dropped off at his residence, Officer McHarg met with the Informant. (*Id.*). The Informant told Officer McHarg that Hector and Blanca had both been at the residence on Sixth Street North in Minneapolis while the Informant was there. (*Id.*). Also, Hector had been cleaning two handguns, one of the guns was Hector's and one was Blanca's, according to the Informant. (*Id.*). In addition, the Informant told Officer McHarg that he had also recently seen Blanca's gun in her possession. (*Id.*). Hector told the Informant that he was going to give his gun to the Runner who was aiding them in storing and delivering narcotics and their proceeds. (*Id.*). While inside the residence, the Informant observed Hector give the Informant money to pay for a storage unit at the Minneapolis storage facility. (*Id.*).

On approximately October 7, 2013, Officer McHarg outfitted the Informant with an audio listening device because the Informant told Officer McHarg that the Runner would drive the Informant to the Minneapolis storage facility and the Informant would help the Runner rent a storage unit for the Trafficker's narcotics. (*Id.*). The Trafficker explicitly instructed the Informant to rent the storage unit. (*Id.*). The instruction came via phone; Hector and Blanca were both present during the call. (*Id.*).

Officer McHarg and other police officers then conducted surveillance and observed the Informant being picked up by an individual believed to be the Runner and a female associate working for the Trafficker in the Chevrolet Aveo. (*Id.*). The officers followed the individuals to a Minneapolis storage facility where the Runner and the Informant entered and talked to an employee about renting a storage unit. (*Id.*). The Runner then drove the Informant back to Hector and Blanca's residence on Sixth Street North in Minneapolis. (*Id.*). While at the residence, the Informant witnessed the Runner give Hector about four ounces of methamphetamine, almost six thousand dollars, and information about the rented storage unit before the Runner, the Informant, and the female associate left the residence. (*Id.*).

The Informant later told Officer McHarg that the Runner rented storage unit number 232, and gave the name Paul Ramos ("Ramos"). (*Id.*). The Informant also provided Officer McHarg with a photo of the rental agreement form. (*Id.*). The Informant also stated that he/she knew the Trafficker, Hector and Blanca planned to use the storage unit for pound quantities of methamphetamine and kilogram quantities of cocaine. (*Id.*). Officer McHarg went to the Minneapolis storage facility and confirmed with records that Ramos rented Unit 232. (*Id.*).

On October 7, 2013, Officer McHarg observed the name "Paul Ramos" on an apartment mailbox and later had a canine officer sniff the door of the apartment; the canine alerted to the

5

odor of narcotics from the apartment. (*Id.*). Officer McHarg then identified Ramos as the Runner using a photo in a law enforcement database. (*Id.*). In addition, the Informant positively identified Ramos as the Runner in a sequential photo lineup. (*Id.*).

Based on information from the Informant, Officer McHarg believed that Hector and Blanca were involved in the drug trafficking organization and controlled most of the Trafficker's narcotics in the Minneapolis area. (*Id.* at 3–4). The Search Warrant for Hector and Blanca's residence on Sixth Street North in Minneapolis was signed on October 10, 2013, and was executed by Officer McHarg and others on October 17, 2013. (*Id.* at 5, 7–11).

After the Search Warrant was signed but before its execution, the Informant continued his communication with Hector, and law enforcement was present during a call between the Informant and Hector where it was agreed that the Informant would help Ramos deliver a safe to Hector. (*Id.* at 3 n.3); *see* (Trujillo-Granados's Supplemental Mem. in Supp. at 4). Officer McHarg subsequently observed the Informant and Ramos carry a black safe together into the residence at Sixth Street North in Minneapolis. (Gov't's Supplemental Resp. at 3 n.3); (Trujillo-Granados's Supplemental Mem. in Supp. at 4). When the Search Warrant was executed on October 17, 2013, law enforcement found a black safe which contained more than six hundred grams of methamphetamine and two handguns. (Gov't's Supplemental Resp. at 3); (Trujillo-Granados's Supplemental Mem. in Supp. at 4–5).

## III. DISCUSSION

Trujillo-Granados now moves the Court for suppression of evidence seized from her residence on October 17, 2013, pursuant to the Search Warrant. (Mot. to Suppress Evidence); (Trujillo-Granados's Supplemental Mem. in Supp. at 8). She argues that the Search Warrant

lacked probable cause, relying largely on *Illinois v. Gates*, 462 U.S. 213 (1983), and was not executed in good faith. (Trujillo-Granado's Supplemental Mem. in Supp. at 1, 5–8).

    **A.**    **Probable Cause**

In determining if probable cause exists, a court considers the information that was before the issuing magistrate judge and affords "great deference to the issuing judge's determination." *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009); *United States v. Carlson*, No. 12-cr-305 (DSD/LIB), 2013 WL 5125434, *35 (D. Minn. Sept. 12, 2013) (citation omitted). Where no evidence outside of the affidavit was submitted to the issuing judge, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Mims*, 567 F. Supp. 2d 1059, 1067 (D. Minn. 2008) (JMR/JSM) (citations omitted). Probable cause exists when the likelihood of finding evidence of a crime in a certain place is fairly probable. *United States v. Chrobak*, 289 F.3d 1043, 10456 (8th Cir. 2002). Moreover, "'[t]he source and credibility of evidence in support of a warrant request is considered in the totality of the circumstances analysis, and a warrant is proper so long as the evidence as a whole creates a reasonable probability that the search will lead to the discovery of evidence.'" *Chrobak*, 289 F.3d at 1046 (quoting *United States v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999)). When information from a confidential informant is contained in an application for a search warrant, the totality of the circumstances must show that the informant is sufficiently reliable. *See United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004) (citing *Gates*, 462 U.S. at 233); *United States v. Gladney*, 48 F.3d 309, 312–13 (8th Cir. 1995) (explaining that even when an informant's information is only partly corroborated, probable cause will still exist when the affidavit also describes the informant's proven reliability established by previous seizures of controlled substances based on the informant's information). "Sufficient reliability

[of an informant] may be shown through 'corroboration by other evidence, or if the informant has a history of providing reliable information.'" *United States v. Gross*, No. 08-cr-254 (MJD/JJK), 2009 WL 430503, at *4 (D. Minn. Feb. 20, 2009) (quoting *Lucca*, 377 F.3d at 933)).

In *Gates*, an anonymous informant wrote law enforcement a letter stating that a husband and wife were selling drugs and the two had specific travel plans and over one hundred thousand dollars of drugs in their home. 462 U.S. at 225; *see also United States v. McBurney*, 546 F. Supp. 2d 658, 663 (D. Minn. 2008) (ADM/FLN). Law enforcement then confirmed the specific details contained in the anonymous letter. 462 U.S. at 225–27; *McBurney*, 546 F. Supp. 2d at 663. The Supreme Court held the independent police work done by law enforcement in confirming the specific details of the couple's travel plans established sufficient probable cause for the issuance of the search warrant. 462 U.S. at 243–46; *see also McBurney*, 546 F. Supp. 2d at 663.

Trujillo-Granados argues Officer McHarg's affidavit does not establish probable cause because it neither describes instances of the Informant providing reliable information in the past **nor** establishes the Informant's reliability or credibility. (Trujillo-Granados's Mem. in Supp. at 6). According to Trujillo-Granados, Officer McHarg had only known the Informant for a month. (*Id.*). In addition, Trujillo-Granados asserts there was no independent corroboration of the Informant's information that Trujillo-Granados's residence contained drugs as the surveillance of the home only showed the Informant entering and leaving twice. (*Id.*). Trujillo-Granados characterizes the Informant's statement that he witnessed Ramos give Corro four ounces of methamphetamine and approximately six thousand dollars as uncorroborated hearsay. (*Id.* at 7). According to Trujillo-Granados, therefore, there was no probable cause to believe contraband would be found in her home. (*Id.*).

Trujillo-Granados's arguments fail; the Court finds the Search Warrant sufficiently supported by probable cause because law enforcement officers independently corroborated the Informant's information, making this case similar to *Gates*. Here, the Informant had direct contact with the Trafficker and identified Hector and Blanca as working for the Trafficker. (Gov't's Ex. 1 at 2).  In addition, the Informant provided specific information about Hector and Blanca, their vehicle, and their plan to rent a storage unit at a storage facility. (*Id.*). Law enforcement conducted surveillance to confirm this information. Surveillance of the residence on Sixth Street North in Minneapolis confirmed that it was the residence of Hector and Blanca and confirmed their vehicle, which was also identified by the Informant. (*Id.*). Surveillance also confirmed the Informant's statement that he and the Runner were going to rent a storage unit at a storage facility. (*Id.* at 3). After police saw the two at the storage facility, they followed them to Hector and Blanca's residence. (*Id.*). Law enforcement also followed up with the storage facility and obtained a photo of the rental agreement from the Informant to confirm the rental of the storage unit. (*Id.*). In addition, the Informant identified Hector and Ramos through a sequential photo lineup. (*Id.*). Here, law enforcement officers independently corroborated much of the information the Informant provided and as detailed later in Officer McHarg's affidavit. *See* (Gov't's Ex. 1). This independent corroboration established probable cause. *See McBurney*, 546 F. Supp. at 663–64; *United States v. Becerra*, No. 07-cr-378 (MJD/RLE), 2008 WL 189955, at *7 (D. Minn. Jan. 22, 2008).

Also, Trujillo-Granados's assertion that probable cause was lacking because law enforcement's corroboration did not substantiate any illegal activity fails because adequate independent corroboration "can consist of verifying details that would not, standing alone, lead police to suspect a crime." *United States v. Taylor*, 106 F.3d 801, 803 (8th Cir. 1997) (citing

9

*United States v. Wilson*, 964 F.2d 807, 809–10 (8th Cir.1992)); *see also United States v. Thompson*, 751 F.2d 300, 302 (8th Cir. 1985).  Probable cause is not diminished by the conduct occurring after the issuing of the warrant but before its execution, namely the Informant's carrying of a safe into the residence of Hector and Blanca.

Because the Court concludes there was probable cause supporting the warrant at the time it was signed, the conduct occurring after the issuance of the Search Warrant is not relevant.  Based on the totality of the circumstances, considering the Informant's reliability and basis for his/her knowledge, the Court finds law enforcement's independent corroboration sufficient to establish probable cause.

### B.     The Good Faith Exception

Trujillo-Granados argues the good faith exception does not apply because Officer McHarg could not have reasonably relied on the validity of the Search Warrant.  (Trujillo-Granados's Mem. in Supp. at 7–8).

Even if a search warrant lacks probable cause evidence seized pursuant to search warrant is admissible if it was objectively reasonable for the officers executing the search warrant to have relied in good faith on the validity of the search warrant.  *United States v. Carlson*, No. 11-cr-363 (JRT/AJB), 2012 WL 836930, at *3 (D. Minn. Mar. 12, 2012) (citing *United States v. Leon*, 468 U.S. 897, 922–23 (1984)).

According to Trujillo-Granados, Officer McHarg's involvement in the investigation and the drafting of the Search Warrant meant that he could not objectively rely on the its validity. (*Id.*).  Trujillo-Granados argues because Officer McHarg knew he did not have probable cause, he waited seven days to execute the Search Warrant, waiting until the Informant carried a safe into Trujillo-Granados's home.  (*Id.* at 8).  Because the Court is satisfied that probable cause

exists, which makes the search warrant valid and a sufficient ground for denying suppression of evidence seized pursuant to the warrant, the Court refrains from conducting a separate analysis on the good-faith exception.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Trujillo-Granados's Motion to Suppress Search and Seizure [Doc. No. 72] be **DENIED**; and

2. Trujillo-Granados's Motion to Suppress Statements, Admissions and Answers [Doc. No. 73] be **DENIED as moot**.

Dated: May 30, 2014

*s/ Steven E. Rau*
Steven E. Rau
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **June 6, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.